THE BORG AND BECK COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 24223, 34964. Promulgated November 30, 1931.

*Irvin H. Fathchild, Esq.*, for the petitioner.
*Arthur Carnduff, Esq.*, for the respondent.

OPINION.

TRAMMELL: The petitioner contends that the actual cash value of the four applications for patents acquired by it from the partnership at the time of organization in May, 1913, was at least $1,000,000. Considering all of the evidence submitted on this point we are of the opinion that the actual cash value of the applications was $700,000 and have so found as a fact. In arriving at this valuation we have given consideration to the testimony of witnesses, the facts known or reasonably anticipated at the basic date, and the close approximation of actual earnings to those anticipated. We have not considered actual earnings further than as to test the reliability of the testimony as to known factors and those previously anticipated. The witnesses however apparently overlooked the fact that anticipated earnings should be reduced to present worth at the basic date.

The petitioner contends that it is entitled to include in its invested capital for 1920 the actual cash value of the applications for patents at the time of acquisition in May, 1913. The respondent contends that the total allowance for intangibles in determining invested capital for 1920 is limited to $20,000, in accordance with the provisions of section 326 (a) (4) of the Revenue Act of 1918.

Section 326 of the Revenue Act of 1918 provides in part as follows:

(a) That as used in this title the term " invested capital " for any year means (except as provided in subdivision (b) and (c) of this section) :

(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year;

(4) Intangible property bona fide paid in for stock or shares prior to March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding on March 3, 1917, whichever is lowest.

At the time of organization in May, 1913, the petitioner issued its entire authorized capital stock of $80,000 par value for the assets of the partnership, of which $45,197.92 par value was for tangible assets, and the remainder, $34,802.08, was for the intangible assets, consisting of good will, patents, and the four applications for patents here involved. No attempt has been made by either of the parties to show what part of the stock issued for intangibles is applicable to good will, or to patents, or to the applications for patents, nor was any attempt made to establish the value of any of the intangibles except the applications for patents. The evidence indicates that the good will acquired from the partnership was valuable to the petitioner. It also indicates that the patents acquired were on woodworking machinery, probably of some value, but no value is shown. The evidence also shows that the applications for patents were of a substantial value, which we have found to be $700,000.

Paragraph (4) of subdivision (a) of section 326 of the Revenue Act of 1918 is a limitation on the amount at which intangible property paid in for stock may be included in invested capital. The provisions of the paragraph limit the inclusion of such property to the smallest of three amounts, namely, the actual cash value of the property at the time paid in for stock, the par value of the stock issued for the property and 25 per cent of the par value of the total stock outstanding on March 3, 1917. In the instant case we have found the four applications for patents had an actual cash value of $700,000, no attempt having been made to show the value of the other intangibles. Stock of the par value of $34,802.08 was issued for intangibles, including the four applications. Since the petitioner's original outstanding capital stock of $80,000 par value remained at that amount until March 30, 1918, 25 per cent of the par value of its outstanding capital stock on March 3, 1917, was $20,000. Since $20,000 is the smallest of the three amounts, it is the largest amount at which the intangibles acquired by the petitioner at the time of organization may be included in invested capital. Even if the entire capital stock of a par value of $80,000 had been issued specifically for the patent application, the 25 per cent limitation would limit invested capital to $20,000 with respect thereto. Neither can any excess value of the applications for patents be included as paid-in surplus, since intangible property may not be included in invested capital as paid-in surplus. See *St. Louis Screw Co.*, 2 B. T. A. 649; *Herald-Despatch Co.*, 4 B. T. A. 1096; *D. N. & E. Walter & Co. et al.*, 10 B. T. A. 620; *E. T. Wright & Co.*, 23 B. T. A. 351.

In recomputing the deficiency for 1920 the intangibles acquired by the petitioner at the time of organization should be included in the petitioner's invested capital at the amount of $20,000.

The petitioner did not submit any evidence with respect to its allegation that the respondent erred in reducing invested capital for 1920 by the amount of $61,973.37 representing additional taxes for prior years. Nor was any reference made thereto in its brief. As the allegation was denied by the respondent, his action is accordingly sustained as to this issue.

The petitioner contends that the respondent erred in failing to allow a deduction against gross income for 1920, 1923 and 1924 on account of the exhaustion of the patents issued to it on the applications for patents acquired from the partnership. While the applications for patents were pending they were not the proper subject of exhaustion, since they had no definite period of useful life. The dates upon which the patents were issued on the applications marked the transformation of what were theretofore nonexhaustible assets into assets subject to exhaustion extending over the 17-year period covered by such patents. *Hershey Manufacturing Co.*, 14 B. T. A.

867. The petitioner having issued its capital stock for the applications for patents and the patents thereafter having been issued on such applications, the cost of the patents to the petitioner was the value of the stock issued therefor. The record does not indicate that any sales of the petitioner's stock were made on or about the time the stock was issued for the applications for patent. The applications for patents having had a value of $700,000 at the time they were paid in for stock, we are of the opinion that under the circumstances the stock issued therefor had a value of the same amount. Consequently the cost of the patents to the petitioner was $700,000. For each of the years 1920, 1923 and 1924 the petitioner is entitled to a deduction against gross income of an aliquot portion of $700,000 based on the life of the patents.

In the petition in Docket No. 34964 the petitioner alleges that the respondent erred in determining that for 1924 the depreciation taken by it was excessive in the amount of $3,201.57. The record is silent as to the nature of the property on which this deduction for depreciation was taken. However, the deficiency notice indicates that it was probably tangible property. The respondent, however, denied that he erred as the petitioner alleged, and, no evidence having been submitted on this issue, the action of the respondent is sustained.

The petitioner contends that the amount of $14,978.30 expended in 1923 in connection with the change of its capital stock from that having a par value to that having no par value and the amount of $12,193 expended in 1924 in connection with the increase of its capital stock from 100,000 shares of no par value to 125,000 shares of no par value constituted operating expenses properly deductible in the respective years. The respondent contends that the amounts constituted capital expenditures and therefore are not deductible as expenses. Since expenditures incurred in acquiring additional permanent capital and in connection with the change of its capital structure are capital expenditures, we think the contention of the petitioner as to the above amounts constituting deductible expenses must be denied. See *Emerson Electric Manufacturing Co.*, 3 B. T. A. 932; *Peaslee-Gaullert Co.*, 14 B. T. A. 769.

The petitioner contends that if the total amounts of $14,978.30 expended in 1923 and $2,193 expended in 1924 are not, as a class, allowable deductions, certain of the items composing these amounts otherwise should be allowed. It contends that the amount of $4,250 paid in 1923 to the Secretary of State of the State of Illinois on the change in capital stock and the amount of $1,250 paid to the same official in 1924 on the increase in capital stock, while being termed fees, were in fact taxes, and as such constitute allowable deductions for the respective years. The respondent urges that such amounts were not taxes, but fees charged for services rendered by the State.

Article V, section 23, of the Illinois constitution provides that the officers composing the executive department of the government of that State and including the secretary of state, shall receive for their services a salary to be established by law, which shall not be increased or diminished during their official terms; that they shall not receive to their own use any fees, cost, perquisites of office, or other compensation. This section further provides that all fees payable by law for any services performed by any officer provided for in this article of the constitution shall be paid in advance into the State treasury.

Chapter 53, paragraph 1, Callaghan's Illinois Statutes Annotated, fixes the annual salaries of certain State officials, including the secretary of state. Paragraph 2 of the same chapter provides in part as follows:

That all fees that now are, or that may be hereafter provided by law to be paid to either of said officers above named, shall be paid in advance into the State treasury, as revenue. The treasurer shall keep a separate account of the amount received from each office, and his receipt shall be retained by the officer rendering the services. In all cases where such officers shall be entitled to fees, they shall render, under oath, to the Governor, a semi-annual report of the amount, and from what sources received:

Chapter 32, paragraph 96, provides in part as follows:

The Secretary of State shall charge and collect an initial fee of one-twentieth of one per centum upon the amount of the capital stock which the corporation is authorized to have, but in no case shall such fee be less than twenty dollars, and a like fee upon any subsequent increase and in addition thereto the same fee as that required for filing other certificates of amendment. In the event that the corporation has capital stock of no par value, its shares, for the purpose of fixing the fee, shall be considered to be of the par value of one hundred dollars per share.

The Supreme Court of Illinois has recognized that what the statutes of the state designate a fee may in fact be a tax. In *Cook County* v. *Fairbank et al.*, 222 Ill. 578; 78 N. E. 895, the court had before it the question as to whether a certain graduated amount designated by the statute as a " docket fee " payable to the clerk of a probate court was in fact a fee. In holding that the amount was not a fee, but a tax, the court said:

Section 12 of article 10 of the Constitution of 1870 provides: " The General Assembly shall, by general law, uniform in its operation, provide for and regulate the fees of said officers [state, county, and township] and their successors, so as to reduce the same to a reasonable compensation for services actually rendered." While the amount demanded of the appellees by said clerk as a condition precedent to the delivery to them of their letters testamentary is designated in the statute " a docket fee," it is apparent that the amount exacted by the clerk was in no way measured by the amount or value of the services performed by him, but the charge against the estate depended entirely

upon the size or amount of the estate. If an estate does not exceed in value $2,000, no docket fee is to be taxed. If it is more than that amount, and does not exceed in value $5,000, a docket fee of $5 is to be taxed, or, if the estate is of the size of the Fairbank estate, a fee of $1,250 is to be taxed, although the docketing of the estate, in each case, in the office of the clerk of the probate court would require the same amount of labor by the clerk, and no more. The provision of the Constitution above referred to, required the General Assembly, by general law, uniform in its operation, to regulate the fees of county officers in such manner that the fees charged and collected by them shall be "a reasonable compensation for services actually rendered." Clearly, the framers of that provision of the Constitution intended that the fees of probate courts in counties of the third class should be based upon the amount, quality, and character of the services performed by the clerks of said courts, and not arbitrarily fixed on the basis of the value or amount of the estates which might pass through those courts, and we think it evident the amount designated in said statute as a docket fee was not intended by the framers of said statute to represent the value of services actually rendered by the probate clerk in each estate in docketing the estate, but that said statute was intended by its framers to furnish a means whereby the public revenues of counties of the third class in the state would be increased, by collecting through the probate court a charge upon the designated estates. The amount sought to be retained by the probate clerk, was, therefore, properly speaking, not a fee, but was a burden or charge imposed upon said estate to raise money for public purposes, regardless of the value of the services actually rendered the estate, which is in conflict with the constitutional provision hereinbefore set forth, and which would bring said burden or charge within the well-recognized definition of a tax, which may, in a general sense, be defined to be a burden or charge imposed by the legislative power of the state upon persons or property for public uses. *Dalrymple* v. *City of Milwaukee*, 53 Wis. 178. 10 N. W. 141.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

It is urged by appellant that this court, in the case of *People* v. *Hinrichsen*, 161 Ill. 223, 43 N. E. 973, is committed to the view that the statute fixing the fees of the Secretary of State for incorporating corporations, which are graduated according to the amount of the capital stock of the corporation, is a valid exercise of legislative power. We are of the opinion there is a well-marked line of distinction between the Hinrichsen Case and the case at bar. It is the same line of demarcation pointed out in the inheritance tax cases heretofore referred to. An inheritance tax was sustained on the ground that it was not a tax upon property, but upon the right of succession, and that the state had the right to prescribe rules of descent and conditions upon which the property should be inherited. So with the right of the state to establish fees in cases of persons desiring to organize corporations. A corporation is a creation of the Legislature. Persons are not obliged to incorporate against their will. If, however, they do incorporate, they must accept the burdens imposed upon them by general law. Such, however, is not the case with the statute authorizing the collection of the docket fee mentioned in the statute now under consideration. That, as was said by Judge Cassoday in *State* v. *Mann, supra*, "is nothing less than a charge imposed by the Legislature as a condition precedent to allowing the county court to proceed with the administration of this estate."

The question presented to the court in the *Hinrichsen* case referred to in the preceding quotation was whether a corporation was required

to pay certain amounts designated by the statute as "fees" in order to increase its capital stock. In holding that the corporation was subject to the payment of the amounts involved, the court held that the purpose of the act imposing the amounts was to derive revenue.

In *Holeproof Hosiery Co.*, 11 B. T. A. 547, a case relied upon by the petitioner, we considered the question of whether an amount paid by a Wisconsin corporation under the laws of that state in connection with an increase of its capital stock was a fee or a tax. With respect to the distinction between a fee and a tax we said:

> Thus strictly speaking, the word "fees" signifies compensation for particular acts or services rendered by proper officers in the line of their duties to be paid by the persons obtaining the benefit of the services or at whose instance they were performed. See *State ex rel. Board of Commissioners* v. *Carey* (Ind.) 84 N. E. 761, 762.
>
> Various circumstances may lead to the conclusion that a certain charge made by a State is a tax. For example, the purpose for which the charge was made may be determinative. *Ward* v. *Maryland*, 12 Wall. 418; *Glasgow* v. *Rowse*, 43 Mo. 479; and *Airway Electric Appliance Corporation* v. *Archer*, *supra*. See also *Harvey* v. *Commonwealth of Virginia*, 20 Fed. 411. The weight of authority holds that where the charge is made primarily for the purpose of revenue, it is a tax. A license is issued under the police power, but the exaction of a license fee with a view to revenue would be the exercise of the power of taxation. See *State* v. *Bengsch*, 170 Mo. 81; 70 S. W. 710.

In concluding that the payment there involved constituted a tax and as such an allowable deduction, although designated a fee by the statutes of the State of Wisconsin, we said:

> We have already said in interpreting section 234 (a) (3) of the Revenue Act of 1918, which is similar to the same section of the Revenue Act of 1921, here involved, that we think Congress used the word "taxes" in this subdivision in a broad sense. *Caldwell Milling Co.*, 3 B. T. A. 1232. Taxes are deductible without regard to their relation to capital or income transactions. *United States* v. *Woodward*, 256 U. S. 632. In the case just cited, the court in holding that a Federal estate tax might be deducted under section 214 (a) (3) of the Revenue Act of 1918, said that if the correct construction should be a matter of doubt, it would follow the rule laid down in *Gould* v. *Gould*, 245 U. S. 151, and construe the Act most strongly against the Government and in favor of the citizen.
>
> Each party might have presented additional evidence which would have given a better picture of the case than we now have. The respondent offered no evidence but relied upon the wording of the Wisconsin statute. However, the evidence which is before us indicates that the exaction from the petitioner was in substantial excess of any special benefits accruing to it; that it bore little, if any relation to the cost of any service rendered by the State, or to reasonable compensation for any trouble or expense on the part of the State on account of the increase in the petitioner's authorized capital stock; that the receipts of the office of the secretary of state from this and similar charges greatly exceeded the portion of the expenses of administration attributable to the performance of any service by the State in connection with the charges;

that the receipts were used for general State purposes and considerable revenue was derived in this way; and, in short, that there was a taking under the guise of taxation. See *Norwood* v. *Baker*, 172 U. S. 269. Under such circumstances we hold that the amount paid was a tax within the meaning of section 234 (a) (3) of the Revenue Act of 1921, and deductible thereunder.

In our opinion the amounts paid to the Secretary of State of Illinois as fees were in fact taxes, and, being such, are deductible as taxes paid.

The petitioner contends that it should be allowed as deductions for 1923 the amounts of $1,000 and $12 expended in that year for United States revenue stamps on the issue of 100,000 shares of no par value stock to replace its par value stock outstanding and to cover miscellaneous stock transfers, respectively.

The Revenue Act of 1921 provides in part as follows:

### TITLE XI.—STAMP TAXES.

SEC. 1100. That on and after January 1, 1922, there shall be levied, collected, and paid, for and in respect of the several bonds, debentures, or certificates of stock and of indebtedness, and other documents, instruments, matters, and things mentioned and described in Schedule A of this title, or for or in respect of the vellum, parchment, or paper upon which such instruments, matters, or things, or any of them, are written or printed, by any person who makes, signs, issues, sells, removes, consigns, or ships the same, or for whose use or benefit the same are made, signed, issued, sold, removed, consigned, or shipped, the several taxes specified in such schedule. The taxes imposed by this section shall, in the case of any article upon which a corresponding stamp tax is now imposed by law, be in lieu of such tax.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

### SCHEDULE A.—STAMP TAXES.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

2. Capital stock, issued: On each original issue, whether on organization or reorganization, of certificates of stock, or of profits, or of interest in property or accumulations, by any corporation, on each $100 of face value or fraction thereof, 5 cents: *Provided*, That where a certificate is issued without face value, the tax shall be 5 cents per share, unless the actual value is in excess of $100 per share, in which case the tax shall be 5 cents on each $100 of actual value or fraction thereof, or unless the actual value is less than $100 per share, in which case the tax shall be 1 cent on each $20 of actual value or fraction thereof.

The stamps representing the tax imposed by this subdivision shall be attached to the stock books and not to the certificates issued.

3. Capital stock, sales or transfers: On all sales, or agreements to sell, or memoranda of sales or deliveries of, or transfers of legal title to shares or certificates of stock or of profits or of interest in property or accumulations in any corporation, or to rights to subscribe for or to receive such shares or certificates, whether made upon or shown by the books of the corporation, or

by any assignment in blank, or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer or sale, whether entitling the holder in any manner to the benefit of such stock, interest, or rights, or not, on each $100 of face value or fraction thereof, 2 cents, and where such shares are without par or face value, the tax shall be 2 cents on the transfer or sale or agreement to sell on each share * * *.

There is no controversy between parties as to the amount of $1,000 having been paid by the petitioner for revenue stamps which it used in connection with the issue of the 100,000 shares of no par value stock, nor does the respondent advance any argument as to why the amount should not be allowed as a deduction. In view of the decision in *Cuba Railroad Co.* v. *United States,* 60 Ct. Cls. 272, and the cases there cited, it may well be that the petitioner's exchange of no par value stock for its outstanding par value stock was not subject to the tax imposed by the above quoted provisions of the Revenue Act of 1921. Inasmuch as the petitioner paid the amount in controversy apparently in good faith and in the belief that the amount was due and payable under the Act, and as no contention is advanced that it was ever refunded to the petitioner or ever will be refunded, we do not deem it necessary to decide whether the petitioner was in fact liable for the tax. Since the four-year period within which a refund of the amount could be claimed has expired, we are of the opinion that the petitioner is entitled to a deduction of the amount as taxes paid.

The amount of $12 expended by the petitioner for revenue stamps for miscellaneous stock transfers apparently was expended in connection with the sale or transfer of stock by petitioner's stockholders. At any rate the record does not show that the stamps were used in connection with sales or transfers by the petitioner. Under the above quoted provisions of the 1921 Act, such stockholders were liable for the payment of the tax and not the petitioner. Since the liability for the payment of the tax was that of the stockholders, the tax is not deductible by the petitioner. *A. Eisenberg,* 11 B. T. A. 574.

The petitioner contends that the amount of $1,625 expended in 1923 for the printing of stock certificates should be allowed as a deduction for that year. We think that this expenditure was in the nature of "organization expenses" and should not be deducted as ordinary and necessary expenses.

> *The proceeding in Docket No. 24223 will be restored to the calendar for hearing under Rule 62 (b). In Docket No. 34964 judgment will be entered under Rule 50.*